Our next case for argument is 23-1894 Henkel v. HHS. Mr. Krause, please proceed when you're ready. May it please the Court, Ed Krause on behalf of Petitioner's Appellants Deidre and Alex Henkel as parents of v. H. The Special Master found that Petitioner's met their Alton Prong I burden by providing a reliable theory explaining how the Flumis vaccine was capable of causing narcolepsy via molecular mimicry. This is the heavy lifting that Petitioner's must do to prevail in a non-table vaccine injury case. The Special Master then turned to Alton Prong II, where the task is to determine whether the facts of this case are consistent with that theory of causation based on the totality of Petitioner's evidence. But rather than accepting Petitioner's circumstantial evidence that clearly supported a logical sequence of cause and effect between v. H.'s vaccine and his narcolepsy, the Special Master required Petitioner's to provide direct medical evidence that v. H. in fact underwent an autoimmune process. Evidence that the experts all agreed was unattainable without a dangerous and unnecessary brain biopsy. What's your view on what Prong II does over Prong I in this circumstance? Excellent question. Prong I is asking can the vaccine cause the injury. Prong II asks did the vaccine cause the injury under the facts and circumstances of this case. So the court in the Capizzano case, this court, specifically held that the burden on Petitioner's under Alton Prong II is satisfied when Petitioner's can demonstrate a logical sequence of cause and effect between the vaccine and the injury. A logical sequence of cause and effect between the vaccine and the injury does not require a showing of specific pathological or laboratory findings confirming the v. H. experience in the autoimmune process. Capizzano makes it clear that if you can show that the vaccine can cause the injury within an appropriate time frame, Prong II is really just looking at does it make sense to conclude that the vaccine caused the injury here. But didn't the special master give detailed findings on Prong II and Prong III? And unless we find it's arbitrary and capricious, tell me how we find that arbitrary and capricious. Sure. Well, I would actually argue that it was legal error. I think it is also arbitrary and capricious, her findings, but it's legal error because she elevated the burden on Petitioner's. Petitioner's presented circumstantial evidence. First, how this particular vaccine can cause narcolepsy. Second, that v. H. was a child who was genetically predisposed to developing narcolepsy. Third, that he was healthy when he received the flu vaccine. And then fourth, that after he received the flu vaccine, he developed narcolepsy. But it was the second time he received the flu vaccine. The first time there was no impact, correct? Correct. Okay. And yes, that statement is correct, but it's also not relevant at all to the theory in this case. And that actually is important because that misunderstanding misinformed the special master's decision on Prong III as well as on Prong II. Before we get to Prong III, can I ask you the question I'm afraid to ask after what went down in the prior case? But my understanding, there were three prongs, and you have to prevail on each of these prongs in order to win the case. That is correct. Correct. Petitioner's— So turn to III because that seems a little more straightforward. Yeah, I— If you might. If that's okay with Judge Mazoff, if we would demonstrate. No, please. Sure. I mean, Prong III, I think you're correct in terms of the standard that would apply on Prong III. It really is an argument that the— So it's undisputed there. You said four to six weeks. Yeah. And the special master says, no, the evidence doesn't support it. It supports incurring these at a later time, sometime later. And the special master's decision was erroneous. It ignored— The standard of review that we have.  It was not based on reasonable inferences from the medical literature the petitioner provided, or—and it was—it also misunderstood Dr. Steinman's testimony about a recall response. So two things. One, the literature that she looked at that petitioners provided relating to when narcolepsy occurs after a flu vaccine was looking at diagnosis, right? So she said six months is the appropriate time frame. But that's not the issue on Prong III. The issue on Prong III is when did the symptoms, initial symptoms that ultimately, as they got worse, led to a diagnosis of narcolepsy occur? Those initial symptoms occurred four to six weeks after the vaccination. And those symptoms—those symptoms were fatigue. At that point, at four to six weeks, his doctors didn't diagnose him with narcolepsy. We're under a very deferential standard of review, and I think the government pushes back on your point. Yes. And all the special master found was that the expert failed to explain how a recall response would impact the timing of the disease onset here. And I don't think that's a sort of, you know—we want something that we can review and overturn or reject here. Respectfully, Your Honor. What? Petitioner presented uncontroverted evidence that four to six weeks is the appropriate time frame for an autoimmune condition to occur via molecular mimicry following a vaccine. So the general molecular mimicry theory is utterly consistent with the four to six-week time frame. Second— But are we talking about the recall response? I'm talking about the review. This is the problem. His opinion that this time frame was appropriate for the recall response. That's what the special master was talking about. I'm sorry to interrupt, Your Honor. The special master misunderstood the testimony about a recall response. She thought he was—Dr. Steinman was referring to something called a re-challenge. She asked him questions about it, but he didn't have a reaction after the flu mist when he received it the first time. That has nothing to do with a recall response. A recall response is—it's definitional. It applies if somebody receives a vaccine and then subsequently gets the same vaccine, whatever the response is, is likely to be considered a recall response. It didn't change the timing. Okay. So what I'm struggling with is that the special master did all this and considered all this evidence. And, of course, with my district judge hat, I'll put back on for a second, is I try cases all the time where all the evidence is circumstantial. And the jury decides whether it meets the claim or not or draws whatever reasonable inferences from that. And then I affirm the jury verdict. And in those cases, they can go either way, and I have to affirm the jury verdict. So the special master did that. And with our deferential review, I'm struggling how we get past that. Well, respondent's experts didn't even contest the four- to six-week timing as being inappropriate here. It was just a non—it was sort of a non-contested issue because four- to six-weeks for the onset of symptoms following a vaccine is consistent with everything we understand about the immune response. The special master simply misunderstood the literature because she looked at a sentence that refers to the onset of narcolepsy six months after vaccination, but that's the diagnosis. And the point is, prong three is drilling down and asking, is four- to six-weeks under a preponderance of the evidence standard consistent with what you would expect given the theory of causation, which here, molecular mimicry. So I do think that under a fair reading of the evidence, the special master's finding on prong three is clearly erroneous. And I would like to get back to prong two for a second because I do think it relates to prong three as well. In Capizano, the court, as I mentioned, specifically held that that prong two standard is, can petitioners demonstrate a logical sequence of cause and effect? And in order to— No, prong one is the possibility of causation. Prong two is really more the probability of causation. Prong two is, did it happen in this case? Did this person's injury, was it caused by the vaccine? And you have to prove that by preponderance of the evidence. So how did you do that? What is your evidence to prove not just that there is a medical theory by which it could have resulted? Because here's the thing. Keep in mind that it's possible that a particular thing like narcolepsy maybe could be caused, you know, one in a thousand times by a flu vaccine or something, right? But that means 999 times it's not. It's caused by something else. So it's not—it's certainly—the fact that you satisfy prong one does not mean every one of the cases that where someone has narcolepsy, they were actually caused by a flu vaccine, right? We agree on that. Absolutely. So prong two is where you have to prove, okay, now, in this case, you did it. You overcame a huge hurdle. You established that it's possible and you've got a medical theory of causation that was found to be accepted. And so what—on prong two, what is your precise facts? How did you prove it more likely than not that narcolepsy was caused by the flu vaccine in this case? First, and I know that you're aware of this, the fact that petitioners showed that the vaccine can cause narcolepsy is part of the prong two showing. It's not sufficient, but it's part of that showing. But second of all, petitioners showed that VH was genetically susceptible to developing narcolepsy. VH was healthy. He received the flu vaccine. Four to six weeks later, he had the onset of symptoms of narcolepsy in a manner and time frame that's consistent with petitioner's theory of causation. Capisano tells us that if you meet prong one and you meet prong three, which I understand is disputed, the inquiry under prong two is, are there facts here that are inconsistent? And there are no facts that are inconsistent with the theory that petitioners presented under prong one. And Capisano has a very important quote that it says that the fact that there's a possibility that the injury coincidentally appeared after the vaccine doesn't prevent a finding that more likely than not the vaccine caused it. That's exactly what happened here. But Capisano, I think the section you're referring to says that even if you find one in three, a claimant can't satisfy the first and third without satisfying the second prong where medical records and medical opinions do not suggest that the vaccine caused the injury. But that was not the case here. There was nothing in the medical records that didn't suggest that. And petitioner also provided supporting opinions from treating neurologists that the court refused to credit. One of her, one of his experts, or sorry, treating doctors, Dr. Pfeffer, specifically talked about the concern that this child was injured or that this child's narcolepsy occurred as a consequence of the vaccine. The special master refused to credit that because she said that opinion didn't specifically help her determine that the biological process occurred in VH. That's not the standard. The standard is logical sequence of cause and effect. And ALTIN, if it stands for anything, it stands for the fact that circumstantial evidence is sufficient for petitioners to meet their burden of causation. I mean, in the ALTIN case, the court was looking at the burden that was on petitioners prior to ALTIN. I think that you should save some time for rebuttal because you won't have any otherwise. So let's go on to Ms. is it Yark? Ms. Yark. Good morning. And may it please the court. My name is Madeline Yark. Sorry. No, if you have a question, you're under, go right ahead. There are two issues that kind of just bother me. And so I'll just tell you up front. One is they found prong one. So versus all these cases where they don't even get to prong one. But the special master found prong one. And then second, the issue that bothers me is that the only way to get causation evidence is a brain biopsy, which you cannot do in a live person. So how can they? So the problem is, how can they ever get past that other than a circumstantial case? Your Honor, I'd like to respond to those in part. First, the question about prong one. This court in Votemont has specifically said that there's a preponderant evidence requirement on each prong. So the fact that petitioners did meet their burden on prong one does not mean that they meet their burden on prongs two or three. And while some of the theory that comes from prong one can translate over to two and three, it does not automatically mean that they meet prongs two and three. And the special master in this case found that they didn't. She found that with regards to prong three, that Dr. Steinman, the basis for his theory on prong three was simply adductive reasoning. That it was a zipsed dixit. That he said because the child's onset occurred four to six weeks after the vaccination, that that's the appropriate timeframe in this case. And then, Your Honor, can you remind me of your... The second part was, that bothered me, is the issue that the only way to prove this case to get past prong one would be a brain biopsy. So that's troubling because there's no other way than, other than the way they try to do it, isn't it, to prove it? Respectfully, Your Honor, that's not true. There was testimony from one of our experts, Dr. McGinnity, that he suggested that, and I can give you the page citation. That's appendix 33. That if there was an autoimmune attack going on here, that we would not just expect narcolepsy. We would expect other neurological issues. And there weren't any tests done or any biomarkers found that would indicate that this child's course of narcolepsy was quickened, as Dr. Steinman would suggest. Or that it was different from any other course of narcolepsy. Is that what they have to prove? That their course of narcolepsy was somehow different or quickened from other courses of narcolepsy? Per Dr. Steinman's theory, yes. That was his theory under the recall. And I, when we have a moment, like to address petitioner's concerns about the court's confusion with respect to recall and rechallenge. I'm just trying to understand what they have to prove under Alton prong two in terms of causation. Like, what would you have... What did they need to show that they didn't? Because it surely can't just be that if one of those doctors said did cause rather than may cause, that would have carried water. Because that, I mean, respectfully, that's just a matter of language. You know, that's not... I mean, one of those doctors saying did cause, I mean, some doctors might have been willing to say that regardless of any additional information. I mean, that can't be what it is. It can't be that. It's not. I think, Your Honor, it's the combination of the two. It's the treater statements as well as... The what? The treater statements as well as the lack of biomarkers or testing in this case. Well, the treater statements, I don't see how they help the government at all. Well, it's not... With all of these doctors looking at this narcolepsy and their first instinct is it may have been caused by this vaccine. May have been caused by the vaccine. That feels actually like it helps them, not you. Because if their first instinct is that it might have been caused by the vaccine, even if they don't go so far as to say it was caused by the vaccine, the implication there is that that's their leading theory on what caused it, even if they didn't say it is what caused it. Well, the special master found significant that the... Dr. Freckert, that the sleep addiction specialist, originally found that it was idiopathic hypersomnia and that by time she did make a diagnosis of narcolepsy, as Your Honor said, she said may or may not have. Just to be clear, do you know anything about narcolepsy? Yes, Your Honor. I mean, I don't know much about it. But I imagine that when somebody has trouble sleeping, the very first appointment you go to, they don't say, ah, you have narcolepsy. It feels like it might be one of those things that has to persist over time. You know, I don't know. I'm not a doctor, but maybe you know. I don't know. It seems... I feel like if I went in and said, I'm having trouble sleeping. My kid's not... Or my kid's not sleeping. I feel like the first thing they might say is, you probably have some insomnia. And then when it persists, they might say, oh, maybe now it's actually something more serious. Is that a crazy way to think about this? I don't think that's a crazy way to think of it, Your Honor. As far as I'm concerned, narcolepsy is often treated as a diagnosis which... in which other diagnoses need to be excluded, as you suggested. But it's the may or may not have that in addition to Dr. Pfeffer's statements about the H1N1 that the special master reasonably concluded didn't support petitioner's theory. Can I interrupt for a minute? What bothered me and what... I had trouble on how to take what the government was saying is I thought most... So tell me if I'm wrong. I read most of your argument on Prog 2 as being nod, nod, wink, wink. We think he got it wrong on Prog 2. She is never agreeing to nod, nod, wink, wink. When you say, tell me if I get it wrong, and you start with nod, nod, wink, wink. You know, she'd have to say, that's what's in our brief. I read your brief as really not appealing the finding of Prog 1, but describing your argument on Prog 2, kind of tagging it on to Prog 1. Well, Prog 1 wasn't really strong, and the special master shouldn't have or didn't do this. Am I misreading it, or did the government... Does the government disagree with the finding on 1, and do they not use that disagreement on Prog 1 to argue Prog 2? I understand your confusion, Your Honor. It's my understanding that Respondent offered its criticisms on Prog 1 because petitioners tried to suggest that Prog 1 covered the deficiencies on Prog 2, so we felt compelled to respond to the specifics on Prog 1. Respondent did not file a motion for review because the special master did find that petitioners did not meet their burden on Progs 2 and 3, so there was, in effect, no reason for us to appeal her findings on Prog 1. And while we disagree that the flu mask vaccine does cause or can cause narcolepsy, we don't find that the special master committed error in her analysis on Prog 1. Thank you. Okay. Can I move you to Prog 3? Yes, ma'am. Which I find, as I said earlier, the easiest to get through. So you heard your friend's response to, and I think it was predominantly, the special master misunderstood the expert's testimony with regard to recall, and it wasn't recall and so forth, so can you respond to that? Yes, Your Honor. I'd like to direct the Court's attention to a portion of the hearing testimony. This is at Appendix 741, Your Honor. This is sort of the beginning of the discussion. 741? That's correct, Your Honor.  I'll give you all a moment to. Starts by talking about COVID, which is not a good sign. No, Your Honor, I would agree. So at the bottom of that page, the argument I believe the petitioner is making is from where? I believe that the special master misspoke. She said in that last sentence at line 23, evidence of re-challenge. But what I think is significant is if you track that conversation between special master Sanders and Dr. Steinman, it's clear that he didn't correct her and that she understood that it was recall. She regurgitates back to him. So this is her question on line 23. This is her speaking.  But then the answer starts off talking about a recall response.  So it is our position that that's what the petitioner is quoting, that that is her misspeaking. But when you go to look at the decision, she speaks exclusively about recall. And even by the end of this conversation, she... I was going to ask if there's any other questions. Her very next question was recall. Her very next question at the top of the next page.  What happens in the recall response? She gives him the opportunity to correct me if I'm wrong. Dr. Steinman, isn't this what recall is? And isn't it true that you don't have evidence in this record? Even the petitioner's answer in this instance indicates that they were understanding her question to be recall.  I mean, okay. But what about this where she says there is no evidence of an immune response during the first injection? Well, I mean, it wouldn't be during the injection, right? It would be after. So that's a little sketch. But, you know, there is some evidence after. I mean, the mother took the child to the doctor after. No? The first injection that she was talking about was the first flu misinjection, which was actually two years before the vaccination. Do you call mist an injection? I mean, that was confusing me, too. Yeah, it's the nasal one. Right, yeah. I mean, you spray it up your nose. That doesn't feel like it meets the definition of injection in my mind, but whatever. I'm not a doctor. Maybe it does. So you're saying after the first one, there were no symptoms? Correct. And it was Dr. Steinman's position and, I believe, respondent's argument that they wouldn't have expected there to be. And that's where Petitioner seems to draw some sort of conclusion that the special master was confused. But looking at the testimony and the record as a whole in the special master's decision, she was not confused. She understood what he was saying, and she just found his answers lacking and his evidence lacking. And, therefore, the petitioners didn't meet their burden on PRONC 3. And this is another area where maybe I'm just being paranoid. I read the government as sort of walking away or distancing itself from what the special master found. On this other vaccine they had, Palamec, what's it called? There was another vaccine that they rely on. Panamax? Panamax, yes. The special master says, this is for a different vaccine, so I'm not going to count the fact that it's two months. The government seems to not embrace that argument and argue solely, well, we're looking at four to six weeks, and that's not two months, so it doesn't count. Am I reading too much into that? Respectfully, maybe, Your Honor. I think that what would help, Your Honors, would be if we looked at the appendix with respect to the four to six weeks as well as the six-month quotations that Petitioner is relying on. Starting with appendix at 2149. 2149. So as Respondent sets forth in a brief, this is the data that Petitioners are relying on. What is this document? This is one of the pieces of medical literature that Petitioner submitted in support of their theory. And I'm looking at the paragraph under the heading, vaccination history in cases with onset since October 2009. About maybe two-thirds of the way down, there's a sentence that starts with, in this sample. It says, in this sample, 27 out of 150 cases recalled having been sick with an infection in a few months prior to the onset of narcolepsy. And Respondents briefly point out that that is what Petitioners are relying on in support of a two-month onset. But what we point to, Your Honor, is on appendix at 1182. Oh, I'm sorry. That may be the incorrect page. One moment. Actually, it's 2150. I do apologize. So it was just the very next page. This is Respondent support for the fact that actually there is evidence. Four to six months is at the top of the page. Yes. The last sentence in the first paragraph. Is it the Hahn reference? Yes. Where it says, based on animal studies, approximately 80% of cell loss is needed to exhibit symptoms, possibly explaining the four- to six-month delay between winter infection and narcolepsy onset. So Respondent offers that as proof against Petitioner's four- to six-week onset, that actually this literature that they submitted suggests a six-month delay, which would not fit their four- to six-week onset. So your argument is that there is substantial evidence for the Special Master's finding about PROM3 because their own literature had a four- to six-month thing in it, even if other things they submitted suggested a shorter time period. Correct. And I would add that Dr. Steinman at the hearing also indicated that the time that Judge Proust asked about was, quote, months to a lot longer. And that is at Appendix 714. Anything further? No, Your Honor. So if you have nothing further, we ask this Court to affirm the opinion of the Court of Federal Claims in the decision. Okay. Thank you, Ms. Yark. Mr. Krauss, you have some, give him two minutes for rebuttal time, please. Thank you. So that Appendix 2150, the animal study that's looking at 80% cell loss, wasn't even referenced by the Special Master. And it's not, we acknowledge that this literature talks about six months as the timeframe for narcolepsy to appear as a diagnosis following the flu vaccine. We're not disputing that. But that's not the issue on Prong 3. The issue on Prong 3 is more immunological or scientific. It's when would you expect to see the onset of symptoms that could lead to narcolepsy. And the literature the petitioner presented is entirely consistent with the four- to six-week timeframe. The problem is that hand reference could be read either way. It could be read the way you just suggested, or it could be read to be talking about the onset of symptoms. It's not specific. But I review for substantial evidence, which means I have to defer to how the lower tribunal may have chosen to read it. And respectfully, Your Honor, your comment earlier, which was sort of a common sense observation, is about the difference between a child starting to show symptoms of narcolepsy. I'm no doctor. You should not listen to anything I say. But your instincts are excellent because that's what those experts. No, they're not. But Dr. Moore, no, Chief Judge Moore, the experts in this case did, in fact, agree that the diagnosis of narcolepsy is complicated for all the same reasons that we've previously discussed. If I was making this determination to no vote, you'd have a much stronger chance, right? But under a substantial evidence theory, I can't supplant my thinking with what might be in the record to otherwise support the decision that was made. And I understand and respect that. I would just circle back to the fact that the four- to six-week timing for onset of symptoms is entirely consistent with literally hundreds of cases in the vaccine program that are looking at injuries caused by vaccines via molecular mimicry. That four- to six-week time period is, I mean, for example, the flu vaccine causing GBS is a table injury based on three to 42 days after the vaccination. So this is a timeframe that we're all comfortable with as being appropriate for a vaccine to cause the onset of autoimmune symptoms. Thank you, Your Honor. I thank both counsel. This case is taken under submission.